IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 5:17CR50001-001 |
| | ) |
| MICAH NEAL | ) |
| | ) |
| | ) |
| | ) |

**PLEA AGREEMENT**

Pursuant to Rule 11(c)(1) of the Federal Rules of Criminal Procedure, the parties hereto acknowledge that they have entered into negotiations which have resulted in this Agreement. The agreement of the parties is as follows:

**WAIVER OF INDICTMENT AND
PLEA OF GUILTY TO INFORMATION**

1. The Defendant Micah Neal agrees to waive Indictment by a grand jury, and consents to the filing of an Information charging the Defendant with one count of conspiracy to commit honest services mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, 1346, all in violation of 18 U.S.C. § 1349. The Defendant further agrees to plead guilty to the Information.

**ADMISSION OF FACTUAL BASIS IN SUPPORT OF GUILTY PLEA**

2. The Defendant has fully discussed with defense counsel the facts of this case and the elements of the crime to which the Defendant is pleading guilty. The Defendant has committed each of the elements of the crime to which the Defendant is pleading guilty, and admits that there is a factual basis for this guilty plea. The following facts are true and undisputed:

a. Defendant **MICAH NEAL** has served as a Representative in the Arkansas House of Representatives from 2013 to the present. As a member of the Arkansas House of

Representatives, NEAL represented District 89 of the State of Arkansas, which includes parts of Washington County in the Western District of Arkansas, Fayetteville Division. As a Representative in the Arkansas House of Representatives, NEAL had responsibility and authority to, among other things, draft and vote on proposed bills and legislation, and to appropriate government monies including funds from the State of Arkansas's General Improvement Fund (GIF).

b.        "Senator A" has served as a Senator in the Arkansas Senate from 2013 to the present.  Prior to his service in the Arkansas Senate, Senator A served as a Representative in the Arkansas House of Representatives from 2007 until 2012.

c.        "Entity A" was a non-profit corporation, with an address in the Western District of Arkansas, Fayetteville Division, that purportedly sought to create manufacturing jobs in northwest Arkansas, specifically for a specialized workforce including disabled veterans, disadvantaged youth, and individuals recovering from substance abuse.  Entity A was associated with "Entity A-1," which was a healthcare provider with facilities in the Western District of Arkansas and elsewhere.

d.        "Person A" was the incorporator, registered agent, and a member of the board of directors for Entity A.  Person A was also a high-ranking executive with Entity A-1. Person A also worked as a licensed lobbyist in the State of Arkansas.

e.        "Entity B" was a non-profit corporation operating a college located in Springdale, Arkansas, in the Western District of Arkansas.

f.        "Person B" was the president of Entity B and a friend of Senator A.

g.        "Person C" was the incorporator and sole member of a limited liability corporation incorporated in the State of Arkansas that purportedly provides consulting services.

Person C also was a friend of Senator A and Person B.

      h.      The Northwest Arkansas Economic Development District (NWAEDD) was a non-profit corporation with offices in Harrison, Arkansas, in the Western District of Arkansas. Pursuant to Act 118 of 1969, as amended, the Arkansas General Assembly established a program for financial assistance to the NWAEDD and seven other economic development districts, with certain counties designated within each district. The NWAEDD consists of Benton, Washington, Madison, Carroll, Boone, Newton, Marion, Searcy, and Baxter counties, all of which are located in the Western District of Arkansas. According to statute, the operations of the NWAEDD and the other economic development districts are solely within the discretion and control of the local governing boards of directors of the respective districts.

      i.      In 2013, the Arkansas General Assembly appropriated GIF monies to the Arkansas Department of Finance and Administration (DFA) for disbursement to the NWAEDD to be used for various economic development grants to governmental entities and non-profit organizations in the State of Arkansas. Specifically, in or about February 2013, Senator A sponsored a bill in the Arkansas Senate that appropriated GIF money to the DFA in order for the DFA to issue grants up to $2 million to each Arkansas economic development district including the NWAEDD. In or about March 2013, NEAL co-sponsored a bill in the Arkansas House of Representatives that appropriated GIF money to the DFA in order for the DFA to issue grants up to $15 million to each Arkansas economic development district including the NWAEDD.

      j.      In or about March and April 2013, NEAL and Senator A voted for passage of the Senate and House bills appropriating GIF monies to the DFA for disbursement to the NWAEDD. In or about April 2013, NEAL and Senator A voted for passage of two bills that funded the previously approved GIF appropriation bills including those sponsored by NEAL and

Senator A for appropriation to the DFA for disbursement by the NWAEDD.

k.    In or about August 2013, as a result of the enactment of the GIF appropriation bills that NEAL and Senator A co-sponsored and sponsored, respectively, and the funding bills for which NEAL and Senator A voted in favor, the NWAEDD received a wire transfer of GIF money from the DFA. This GIF money was deposited in the NWAEDD's Arvest Bank account ending in 8611.

l.    At all times relevant to this Information, the NWAEDD awarded GIF grants to an eligible organization or entity from GIF money appropriated by NEAL and Senator A only with the approval of NEAL and Senator A. NEAL and Senator A, in effect and in practice, controlled the GIF monies that they had appropriated. Specifically, the NWAEDD awarded GIF monies to eligible entities and organizations only with approval by and authorization from NEAL and Senator A, and in the amounts designated by NEAL and Senator A. Upon receiving the GIF monies appropriated by the Arkansas General Assembly, the NWAEDD created spreadsheets whereby the NWAEDD tracked and accounted for the GIF monies appropriated by NEAL and Senator A and which contained as a beginning balance the amount of GIF money that each legislator controlled. As GIF money was awarded at the direction of NEAL and Senator A, the NWAEDD would deduct that money from the total on their spreadsheets.

## Honest Services Fraud Concerning Entity A

m.    In 2013, Senator A advised NEAL that if NEAL, as an Arkansas Representative, authorized and directed GIF money to Entity A, then Person A would pay NEAL a portion of the money in exchange for NEAL's official action.

n.    NEAL and Senator A agreed to authorize and direct a total of $400,000 of the GIF money—which had been allocated from the appropriation bills that NEAL and Senator A

sponsored and approved, respectively—to Entity A in exchange for kickbacks they would receive from Person A. Of the $400,000, NEAL agreed to direct $125,000 of the GIF money to Entity A, and Senator A agreed to direct $275,000 of the GIF money to Entity A.

o.     Emails, constituting interstate wire communications, demonstrate that Entity A received the $400,000 GIF grant at the direction of NEAL and Senator A. For instance, on or about July 26, 2013, NEAL emailed, via interstate wire, the Director of the NWAEDD, stating, "I'm partnering with Senator [A] for $125,000 to go towards [Entity A]. Senator [A] is pitching in $275,000 for a total of $400,000. This is an email to authorize the distribution of $125,000 of my GIF." The Director of the NWAEDD replied, "Thanks for your communication. We have not received authorization or funds from the Department of Finance and Administration yet, but expect it around the first of August. As soon as we are authorized we will get the application forms to [Entity A] and work with them on the project. I did talk to [Senator A] earlier today and expect some information coming my way."

p.     In or about September 2013, Senator A sent numerous emails, via interstate wire communications, to the Director of the NWAEDD, instructing the Director as to which grantees Senator A wanted his appropriated GIF money to be sent and in what amounts. Among his emails to the Director, Senator A directed $275,000 to Entity A.

q.     On or about September 27, 2013, the NWAEDD issued two checks to Entity A-1, drawn on the NWAEDD's Arvest Bank account ending in 8611, in the amounts of $275,000 and $125,000, respectively. The two checks constituted GIF monies that had been appropriated by NEAL and Senator A, and were awarded pursuant to a GIF grant application signed by Person A. The checks to Entity A-1 were mailed from the NWAEDD office to Senator A at an address in Springdale, Arkansas that Senator A had provided to the Director of the NWAEDD.

r.     Also on or about September 27, 2013, the NWAEDD issued an award letter addressed to Person A notifying Person A of the $125,000 GIF grant awarded to Entity A-1 and stating that the "funds were appropriated to the GIF program through an Act sponsored by Representative Neal." A similar award letter was issued by the NWAEDD for the $275,000 grant but which referenced the funds were appropriated "through an Act sponsored by [Senator A]."

s.     On or about September 30, 2013, the checks from the NWAEDD to Entity A-1 were deposited in Entity A's U.S. Bank account ending in 9717. On or about October 1, 2013, Arvest Bank settled the checks totaling $400,000 with U.S. Bank via an interstate wire communication.

t.     The spreadsheets maintained by the NWAEDD for NEAL and Senator A showed a deduction in September 2013 of $125,000 and $275,000, respectively, for the NWAEDD GIF grant awarded to Entity A.

u.     Following the receipt of NEAL's GIF money in the amount of $125,000, and in return for NEAL's official actions to authorize and facilitate the appropriation of the GIF money, Senator A paid NEAL a total of $20,000 in cash on behalf of Person A.

### Honest Services Fraud Concerning Entity B

v.     In or around 2014, Senator A told NEAL that if NEAL, as an Arkansas Representative, authorized and directed GIF money to Entity B, then Person B would pay NEAL a portion of the money in exchange for NEAL's official action.

w.     NEAL and Senator A agreed to authorize and direct a total of $200,000 of GIF money to Entity B in exchange for kickbacks from Person B. Of the $200,000, NEAL agreed to direct $50,000 of the GIF money to Entity B, and Senator A agreed to direct $150,000 of the GIF money to Entity B.

x.     On or about December 18, 2014, the NWAEDD issued a check in the amount of $200,000, and drawn on the NWAEDD's Arvest Bank account ending in 8611, to Entity B.  The check constituted GIF monies that had been appropriated by NEAL and Senator A, and was awarded pursuant to a GIF grant application signed by Person B that had been emailed, via interstate wire communications, to the NWAEDD from Entity B in Springdale, Arkansas, on or about December 5, 2014.   The application requested a $200,000 GIF grant and listed NEAL and Senator A as sponsors.

y.     On or about December 19, 2014, the $200,000 check from the NWAEDD to Entity B was deposited into Entity B's Centennial Bank account ending in 0681.   Arvest Bank subsequently settled the check totaling $200,000 with Centennial Bank via an interstate wire communication.

z.     The spreadsheets maintained by the NWAEDD for NEAL and Senator A showed a deduction in December 2014 of $50,000 and $150,000, respectively, for the GIF grant awarded to Entity B.

aa.     A check dated January 5, 2015 and drawn on Entity B's Centennial Bank account ending in 0681 in the amount of $65,000 was issued to Person C's company and deposited that same day into Person C's company's Arvest Bank account ending in 7761. The check was issued at the direction of Person B. Over the following three days, Person C made three cash withdrawals per day totaling $53,700 from his company's Arvest Bank account ending in 7761.

bb.     Between approximately December 19, 2014 and approximately January 30, 2015, and following Entity B's receipt of NEAL's and Senator A's GIF money in the amount of $200,000, Senator A contacted NEAL and told him that Person C would be bringing $18,000 in cash to NEAL in exchange for NEAL having authorized and directed the appropriation of the GIF

money to Entity B.

cc.     Between approximately December 19, 2014 and approximately January 30, 2015, and following NEAL's communication with Senator A, Person C met with NEAL and, on behalf of Person B, paid NEAL $18,000 in cash.

dd.     NEAL agrees and stipulates that he conspired with Senator A and others in the Western District of Arkansas and elsewhere to deprive the citizens of the State of Arkansas of his honest services as an Arkansas state legislator by taking official actions and using his official position to appropriate and direct funds to Entity A and Entity B in exchange for kickback payments, and that the conspiracy and scheme to defraud the citizens of the State of Arkansas of his honest services involved the use of interstate wire communications and mailings that were sent and/or received in the Western District of Arkansas.  Those interstate wire communications and mailings included emails sent to the Director of NWAEDD in the Western District of Arkansas from NEAL and other co-conspirators; interstate wire communications and signals whereby funds involved in the scheme were settled between Arvest Bank, U.S. Bank, and Centennial Bank; and mailings of GIF grant applications, grant agreements, award letters, and checks to and/or from the NWAEDD offices in Harrison, Arkansas.

ee.     The preceding summary is made for the purpose of providing the Court with a factual basis for NEAL's guilty plea.  The facts set forth in this summary are supported by witness statements, emails, bank records, and other documentary evidence.  The preceding summary does not include all of the facts known to NEAL concerning criminal activity in which he or others engaged, nor does it contain all of the facts that the government could prove in a trial against NEAL.

## ADVICE OF RIGHTS

3.      The Defendant hereby acknowledges that he has been advised of and fully

understands the following constitutional and statutory rights:

        a.     to have an attorney and if the Defendant cannot afford an attorney, to have one provided to him and paid for at the United States' expense;

        b.     to persist in his plea of not guilty;

        c.     to have a speedy and public trial by jury;

        d.     to be presumed innocent until proven guilty beyond a reasonable doubt;

        e.     to confront and examine witnesses who testify against him;

        f.     to call witnesses on his behalf;

        g.     to choose to testify or not testify and that no one could force the Defendant to testify; and,

        h.     to have at least 30 days to prepare for trial.

## WAIVER OF RIGHTS

4.      The Defendant hereby acknowledges that he understands with respect to the count

to which he pleads guilty, he thereby WAIVES all of the rights listed as (b) through (h) of the

above paragraph.

## WAIVER OF ACCESS TO RECORDS

5.      The Defendant hereby waives all rights, whether asserted directly or by a

representative, to request or receive from any department or agency of the United States any

records pertaining to the investigation or prosecution of this case, including without limitation any

records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy

Act of 1974, 5 U.S.C. § 552a.

## WAIVER OF "HYDE" CLAIM

6.      The Defendant hereby waives any claim under the Hyde Amendment, 18 U.S.C. §

3006A (Statutory Note), for attorney fees and other litigation expenses arising out of the

investigation or prosecution of this matter.

### EFFECTS OF BREACH OF THIS AGREEMENT BY DEFENDANT

7.      The Defendant agrees that if after signing this Plea Agreement the Defendant commits any crimes, violates any conditions of release, or fails to appear for sentencing, or if the Defendant provides information to the Probation Office or the Court that is intentionally misleading, intentionally incomplete, or intentionally untruthful, or if the Defendant violates any term of this Plea Agreement, takes a position at sentencing which is contrary to the terms of this Plea Agreement, or attempts to withdraw from this Plea Agreement, this shall constitute a breach of this Plea Agreement which shall release the United States from any and all restrictions or obligations placed upon it under the terms of this agreement and the United States shall be free to reinstate dismissed charges or pursue additional charges against the Defendant.   The Defendant shall, however, remain bound by the terms of the Agreement, and will not be allowed to withdraw this plea of guilty unless permitted to do so by the Court.

8.      The Defendant further agrees that a breach of any provisions of this Plea Agreement shall operate as a WAIVER of Defendant's rights under Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, and the United States shall be allowed to use and to introduce into evidence any one or more of the following:

        a.      admissions against interest, both oral and written, made by the Defendant to any person;

        b.      statements made by the Defendant during his change of plea hearing;

        c.      the factual basis set forth in the Plea Agreement;

        d.      any testimony given under oath in these proceedings or to a grand jury or a petit jury;

        e.      any and all physical evidence of any kind which the Defendant has provided to the United States; and,

        f.      any and all information provided by the Defendant to the United States' attorneys, or to federal, state, county, and/or local law enforcement officers.

9.      The Defendant understands and agrees that the United States shall only be required to prove a breach of the Plea Agreement by a preponderance of the evidence.   The Defendant

further understands and agrees that the United States need only prove a violation of federal, state, or local criminal law by probable cause in order to establish a breach of this Plea Agreement.

## MAXIMUM PENALTIES

10.     The Defendant hereby acknowledges that he has been advised of the maximum penalties for the count to which he is pleading guilty.   By entering a plea of guilty to the one count Information, the Defendant agrees that he faces:

   a.     a maximum term of imprisonment for 20 years;
   b.     a maximum fine of $250,000.00 or twice the pecuniary gain;
   c.     both imprisonment and fine;
   d.     a term of supervised release, up to three years, which begins after release from prison;
   e.     a possibility of going back to prison if the Defendant violates the conditions of supervised release;
   f.     a special assessment of $100.00; and,
   g.     restitution as ordered by the Court.

## CONDITIONS OF SUPERVISED RELEASE

11.     The Defendant acknowledges that if a term of supervised release is imposed as part of the sentence, the Defendant will be subject to the standard conditions of supervised release as recommended by the United States Sentencing Commission and may be subject to other special conditions of supervised release as determined by the Court.   The standard conditions of supervised release are as follows:

   a.   The defendant shall report to the probation office in the federal judicial district where he or she is authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.
   b.   After initially reporting to the probation office, the defendant will receive instructions from the court or the probation officer about how and when to report to the probation officer, and the defendant shall report to the probation officer as instructed.
   c.   The defendant shall not knowingly leave the federal judicial district where he or she is authorized to reside without first getting permission from the court or the probation officer.
   d.   The defendant shall answer truthfully the questions asked by the probation officer.

 e. The defendant shall live at a place approved by the probation officer. If the defendant plans to change where he or she lives or anything about his or her living arrangements (such as the people the defendant lives with), the defendant shall notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

 f. The defendant shall allow the probation officer to visit the defendant at any time at his or her home or elsewhere, and the defendant shall permit the probation officer to take any items prohibited by the conditions of the defendant's supervision that he or she observes in plain view.

 g. The defendant shall work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses the defendant from doing so. If the defendant does not have full-time employment he or she shall try to find full- time employment, unless the probation officer excuses the defendant from doing so. If the defendant plans to change where the defendant works or anything about his or her work (such as the position or the job responsibilities), the defendant shall notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

 h. The defendant shall not communicate or interact with someone the defendant knows is engaged in criminal activity. If the defendant knows someone has been convicted of a felony, the defendant shall not knowingly communicate or interact with that person without first getting the permission of the probation officer.

 i. If the defendant is arrested or questioned by a law enforcement officer, the defendant shall notify the probation officer within 72 hours.

 j. The defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or Tasers).

 k. The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

 l. If the probation officer determines that the defendant poses a risk to another person (including an organization), the probation officer may require the defendant to notify the person about the risk and the defendant shall comply with that instruction. The probation officer may contact the person and confirm that the defendant has notified the person about the risk.

 m. The defendant shall follow the instructions of the probation officer related to the conditions of supervision.

## RESTITUTION

12.     The Defendant agrees to pay full restitution to all victims of the offenses to which the Defendant is pleading guilty, to all victims of any offenses dismissed as a result of this Plea Agreement, and for all losses caused by the Defendant's criminal conduct even if such losses resulted from crimes not charged in the Information or admitted to by the Defendant in the factual statement.  The Defendant acknowledges and agrees that all restitution as agreed to above shall be governed by the provisions of the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A.   The Defendant understands full restitution will be ordered regardless of the Defendant's financial resources.  The Defendant further understands the restitution will be determined by the Court. The Defendant agrees to cooperate in efforts to collect the restitution obligation, by any means the United States deems appropriate and agrees to waive any defense or objections to any action to enforce the collection of the restitution.  The Defendant understands imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.  The Defendant acknowledges that any restitution imposed is not dischargeable in any bankruptcy proceeding pursuant to 18 U.S.C. § 3613(e).

## COOPERATION WITH THE UNITED STATES

13.     The Defendant agrees to fully, voluntarily, and truthfully cooperate with the United States and disclose all information which the Defendant possesses relating to the activities set forth in the Information and all other information concerning any criminal activity which is the subject of investigation by any law enforcement agency.   The Defendant's obligation of truthful and unreserved disclosure includes any obligation to provide upon request any documents, records, or other tangible evidence within the Defendant's control.  The Defendant agrees to testify before the grand jury and/or at any trial as requested by the United States.

## NO OTHER CHARGES

14.     The United States agrees that no other federal charges, which stem from the activities described in the Information, will be brought against the Defendant in the Western District of Arkansas.

## SENTENCING GUIDELINES ARE ADVISORY BUT NOT MANDATORY

15.     The parties acknowledge that the Court shall consult and take into account the United States Sentencing Commission Guidelines in determining the sentence, but that the Court is not bound by the Guidelines and may sentence the Defendant to any sentence within the statutory range.

## AGREEMENT DOES NOT PROMISE A SPECIFIC SENTENCE

16.     The Defendant acknowledges that discussions have taken place concerning the possible guideline range which might be applicable to this case.   The Defendant agrees that any discussions merely attempt to guess at what appears to be the correct guideline range and do not bind the District Court.   Further, the Defendant acknowledges that the actual range may be greater than contemplated by the parties.   In the event that the actual guideline range is greater than the parties expected, the Defendant agrees that this does not give him the right to withdraw his plea of guilty.

## RELEVANT CONDUCT CONSIDERED

17.     At the sentencing hearing, the United States will be permitted to bring to the Court's attention, and the Court will be permitted to consider, all relevant information with respect to the Defendant's background, character, and conduct, including the conduct that is the subject of this investigation for which he has not been charged up to the date of this Agreement, and/or which is the basis for any of the counts which will be dismissed pursuant to this Agreement, as provided by

§ 1B1.3 of the Sentencing Guidelines.

## PERJURY

18. In the event that it is determined that the Defendant has not been truthful with the Court as to any statements made while under oath, this Agreement shall not be construed to protect the Defendant from prosecution for perjury or false statement.

## CONCESSIONS BY THE UNITED STATES

19. The United States agrees to recommend that the Defendant be sentenced to a term of imprisonment within the guideline range as determined by the Court. The parties acknowledge that the Court is not bound by the recommendation and may impose any sentence authorized by law.

20. The United States agrees not to object to a recommendation by the Probation Office or a ruling of the Court which awards the Defendant an appropriate-level decrease in the base offense level for acceptance of responsibility. If the offense level in the Presentence Report is 16 or greater and the Court accepts a recommendation in the Presentence Report that the Defendant receive two points for acceptance of responsibility, the United States agrees to move for an additional one-point reduction for acceptance of responsibility for a total of three points. However, the United States will not be obligated to move for an additional one-point reduction or recommend any adjustment for acceptance of responsibility if the Defendant engages in conduct inconsistent with acceptance of responsibility including, but not limited to, the following: a) falsely denies, or makes a statement materially inconsistent with, the factual basis set forth in this Agreement; b) falsely denies additional relevant conduct in the offense; c) is untruthful with the United States, the Court, or probation officer; or d) materially breaches this Plea Agreement in any way.

21.     The United States agrees to advise the Probation Office and the Court of the extent and nature of the Defendant's cooperation. The Defendant's agreement to cooperate with the United States is made pursuant to U.S.S.G. §§ 1B1.8(a) & (b). If the Defendant provides full, complete, truthful, and substantial cooperation to the United States, the United States reserving the right to make the decision on the nature and extent of the Defendant's cooperation, then the United States agrees to consider moving for a downward departure under U.S.S.G. § 5K1.1, 18 U.S.C. § 3553(e), or Rule 35 of the Federal Rules of Criminal Procedure. Both parties acknowledge that the Court has the power to deny a motion for downward departure, and is under no obligation to reduce the Defendant's sentence because of the Defendant's cooperation. The Defendant hereby agrees that the United States does not promise, by the terms of this Plea Agreement, to file a Section 5K1.1, 18 U.S.C. § 3553(e), or Rule 35 motion, and that the decision to move for a downward departure or sentence reduction is left to the United States' sole, unreviewable discretion.

## UNITED STATES' RESERVATION OF RIGHTS

22.     Although the United States agrees not to object to certain findings by the Probation Office or to rulings of the Court, it reserves the right to:

a.     make all facts known to the Probation Office and to the Court;
b.     call witnesses and introduce evidence in support of the Presentence Report;
c.     contest and appeal any finding of fact or application of the Sentencing Guidelines;
d.     contest and appeal any departure from the appropriate guideline range; and,
e.     defend all rulings of the District Court on appeal including those rulings which may be contrary to recommendations made or positions taken by the United States in this Plea Agreement which are favorable to the Defendant.

## NO RIGHT TO WITHDRAW THE GUILTY PLEA

23.     The United States' concessions on sentencing options are non-binding and made

pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure.   As a result, if the Court

should reject the Defendant's requests or recommendations for certain findings of fact or

applications of the Guidelines, the Defendant acknowledges that there is no right to withdraw the

guilty plea.

## AGREEMENT NOT BINDING ON THE COURT

24.     The parties agree that nothing in this agreement binds the Court to:

      a.     make any specific finding of fact;
      b.     make any particular application of the Sentencing Guidelines;
      c.     hand down any specific sentence;
      d.     accept any stipulation of the parties as contained in this Plea Agreement; or
      e.     accept this Plea Agreement.

25.     The United States and the Defendant acknowledge that the Court has an obligation

to review the Presentence Report before it accepts or rejects this Plea Agreement.

## AGREEMENT DOES NOT BIND ANY OTHER ENTITY

26.     The parties agree that this Plea Agreement does not bind any governmental entity

other than the United States Attorney's Office for the Western District of Arkansas and the Public

Integrity Section, Criminal Division, United States Department of Justice.

## SPECIAL ASSESSMENT

27.     The Defendant agrees to pay $100.00 as the special assessment in this case.

## REPRESENTATIONS BY DEFENDANT

28. By signing this Plea Agreement, the Defendant acknowledges that:

    a. The Defendant has read this Plea Agreement (or has had this Plea Agreement read to him) and has carefully reviewed every part of it with defense counsel.

    b. The Defendant fully understands this Plea Agreement and is not under the influence of anything that could impede the Defendant's ability to fully understand this Plea Agreement.

    c. No promises, agreements, understandings, or conditions have been made or entered into in connection with the decision to plead guilty except those set forth in this Plea Agreement.

    d. The Defendant is satisfied with the legal services provided by defense counsel in connection with this Plea Agreement and matters related to it.

    e. The Defendant has entered into this Plea Agreement freely, voluntarily, and without reservation, and the Defendant's desire to enter a plea of guilty is not the result of threats or coercion directed at the Defendant or anyone connected with the Defendant.

## REPRESENTATIONS BY DEFENSE COUNSEL

29. By signing this Plea Agreement, counsel for the Defendant acknowledges that:

    a. Counsel has carefully reviewed every part of this Plea Agreement with the Defendant, and this Plea Agreement accurately and completely sets forth the entire agreement between the United States and the Defendant.

    b. Counsel has explained the ramifications of the Plea Agreement to the Defendant, and believes that the Defendant understands this Plea Agreement, what rights are being lost by pleading guilty, and what the United States has agreed to do in exchange for the plea of guilty.

    c. Counsel believes that the Defendant's decision to enter into this Plea Agreement is an informed and voluntary one.

## PLEA AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT

30. The Defendant and his attorney both acknowledge that this Plea Agreement constitutes the entire agreement of the parties. Further, all parties agree that there are no oral agreements or promises which have been made to induce the Defendant to change his plea to

guilty.

Dated this $\underline{4^{th}}$ day of $\underline{January}$____, 2017.

_____
MICAH NEAL
Defendant

_____
Shane Wilkinson
Attorney for Defendant

_____
Kenneth Elser
United States Attorney
Western District of Arkansas

Raymond Hulser
Chief, Public Integrity Section

_____
Sean F. Mulryne
Trial Attorney
United States Department of Justice
Criminal Division
Public Integrity Section